JOHN COLEMAN
(Name)

27114-001
(Institution Register No.)
UNITED STATES PENITENTIARY CANAAN
POST OFFICE BOX 300
WAYMART, PA 18472
(Current Mailing Address)

FILED
SCRANTON

SEP 3 0 2019

PER _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN COLEMAN, Plaintiff
(Full and Correct Name)

CASE NO. 1:19-CV-1694
(To be supplied by the Clerk)

vs.

UNITED STATES OF AMERICA
_____, Defendants

CIVIL RIGHTS COMPLAINT
PURSUANT TO 28 U.S.C. 1331
FEDERAL TORT CLAIM ACT
PURSUANT TO 28 U.S.C. 2674

## A. JURISDICTION

1) John Coleman (Plaintiff), is a resident of U.S.P. Canaan (State of residency prior to incarceration)

who presently located at Post Office Box 300, Waymart, Pa 18472 (Mailing address or place of confinement.)

2) Defendant United States of America (Name of first defendant) is a resident of

950 Pennsylvania Avenue, NW Washington, DC 20530 (City, State), and is employed as

N/A (Position and title, if any), and may be

located at 950 Pennsylvania Avenue, NW (Address for service of process). At the time the claim(s) alleged

in this complaint arose, was this defendant acting under the color of state law? Yes ✓ No ☐

If your answer is "Yes", briefly explain: _____

_____

1

XE-2 (F)          CIVIL RIGHTS COMPLAINT (28 U.S.C. §1331)

3) Defendant __N/A__ is a resident of
   (Name of first defendant)

   __N/A__, and is employed as
   (City, state)

   __N/A__, and may be located at
   (Position and title, if any)

   __N/A__. At the time the
   (Address for service of process)

   claim (s) alleged in this complaint arose was this defendant acting under the color of state

   law? Yes ☐ No ☐. If your answer is "Yes", briefly explain:

   __N/A__

   (Use the back of this page to furnish the above information for additional defendants.)

4) Jurisdiction is invoked pursuant to 28 U.S.C. §1331(3). (If you wish to assert jurisdiction

   under different or additional statuses, you may list them below.)

   __Federal Tort Claim Act pursuant to 28 U.S.C. 2674__

## B. NATURE OF THE CASE

1) Briefly state the background of your case:

   On or about October 8-10, 2017, I was standing on the top range at U.S.P. Canaan watching T.V. when a inmate that stop taking his psychotic medication walked up to me and started beating me with a metal lock for about 15 minutes while the Unit Officers was no where to be found. Due to that assault I received loss of vision in my right eye, staples and stitches on my head and a fractured nose.

XE-2 (F)          CIVIL RIGHTS COMPLAINT (28 U.S.C. §1331)

2

## C. CAUSE OF ACTION

1) I allege that my claims arise under the following constitutional provisions or laws of the United States and that the following facts form the basis for my allegations: (If necessary you may attach up to two additional pages (8 1/2" x 11") to explain any allegation or to list additional supporting facts.)

   A) (1) Count I: Negligence; failed to provide a safe enviornment in violation of 18 U.S.C. §4042 (2012) (Claim No. TRT-NER-2019-06961 (EX-A))

   (2) Supporting Facts: (Include all facts you consider important, including names of persons involved, places and dates. Describe exactly how each defendant is involved. State the facts clearly in your own words without citing legal authority or argument.): The BOP failed to provide a safe enviornment in light of the violence here at U.S.P. Canaan (EX-B (Murder of Inmate O'Kane)), (EX-C (Stabbing of Officer)), (EX-D (Murder of Officer)), (EX-E), (EX-F)

   B) (1) Count II: Negligence; prison officials had been negligent in failing to protect me from the attack in violation of 18 U.S.C. §4042 (2012)

   (2) Supporting Facts: The Psychology Department never did any checkups on the inmate, also in a March 2008 memo BOP officials admitted that the safety and security of staff and inmate could be in jeopardy (EX-F), yet they (BOP) never changed their policies. (EX-F)

   C) (1) Count III: _____N/A_____

(2) Supporting Facts: _____N/A_____

_____

_____

_____

D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1) Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to the conditions of your imprisonment? Yes ☐ No ☑. If your answer is "Yes", describe each lawsuit. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

   a) Parties to previous lawsuit:

      Plaintiffs: __N/A_____

      Defendants: __N/A_____

   b) Name of court and docket number __N/A_____

   c) Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?) __N/A_____

   d) Issues raised __N/A_____

   e) Approximate date of filing lawsuit __N/A_____

   f) Approximate date of disposition __N/A_____

E. ADMINISTRATIVE RELIEF

1) Have you presented all grounds for relief raised in this complaint by way of BP-9, BP-10, and BP-11 grievances? Yes [✓] No [ ].

2) If your answer to (1) is "Yes", state the date of disposition, result and reasons given for the administrative decision  Tort Claim No. TRT-NER-2019-06961 (EX-A)

3) If your answer to (1) is "No", list each ground not fully presented through the administrative grievance process and explain why it was not  N/A

4) Describe all other procedures you have used (such as tort claim or Parole Commission administrative appeals procedures) to exhaust administrative remedies as to each issue raised.  Tort Claim (TRT-NER-2019-06961 (EX-A))

F. REQUEST FOR RELIEF

5) I believe that I am entitled to the following relief:

Monetary damages in the amount of 2 million dollars for pain, suffering and mental anguish

_____          John Coleman
Signature of Attorney (if any)                     Signature of Petitioner

_____
(Attorney's full address and telephone number)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

JOHN COLEMAN,
    Plaintiff,

Civil No. _____

v.

UNITED STATES OF AMERICA,
    Defendant.

## PLAINTIFF'S EXHIBIT LIST

EX #

| Exhibit | # |
|---|---|
| Tort Claim TRT-NER-2019-06961 | A |
| United States v. Allen Archie Hurley | B |
| United States v. Jose Montalban | C |
| United States v. Jessie Con-Ui | D |
| Newswatch 16 U.S.P. Canaan Officers Interview | E |
| Violence on The Rise In BOP Facilities | F |
| BOP USA Today Article | G |

Dated: September 25, 2019

Respectfully Submitted

JOHN COLEMAN 21114-001
UNITED STATES PENITENTIARY CANAAN
POST OFFICE BOX 300
WAYMART, PA 18472



**U.S. Department of Justice**

Federal Bureau of Prisons

*Northeast Regional Office*

U.S. Custom House
2nd & Chestnut Streets - 7th Floor
Philadelphia, PA. 19106

September 20, 2019

John Coleman, Reg. No. 21114-001
USP Canaan
P.O. Box 300
Waymart, PA  18472

Re: Administrative Claim **Received September 6, 2019**
    Claim No. TRT-NER-2019-06961

Dear Mr. Coleman:

This will acknowledge receipt of your administrative claim for an alleged loss of personal property or personal injury suffered at USP Canaan.

Under the provisions of the applicable federal statutes, we have **six months from the date of receipt** to review, consider, and adjudicate your claim.

All correspondence regarding this claim should be addressed to Federal Bureau of Prisons, Northeast Regional Office, Room 701, U.S. Custom House, 2nd & Chestnut Street, Philadelphia, Pennsylvania 19106. If the circumstances surrounding this claim change in any fashion, you should contact this office immediately. Also, should your address change, you should contact this office in writing accordingly.

Sincerely,

Darrin Howard
Regional Counsel

---

**UNITED STATES OF AMERICA v. ALLEN ARCHIE HURLEY, Appellant**
**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**
**543 Fed. Appx. 249; 2013 U.S. App. LEXIS 22207**
**No. 12-4148**
**October 29, 2013, Submitted Under Third Circuit LAR 34.1(a)**
**October 31, 2013, Filed**

---

**Notice:**

**NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT. PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.**

**Editorial Information: Prior History**

On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. No. 11-cr-360). District Judge: Hon. Robert D. Mariani.

**Counsel** For UNITED STATES OF AMERICA, Plaintiff - Appellee: John C. Gurganus, Jr., Esq., Office of United States Attorney, Scranton, PA.

ALLEN ARCHIE HURLEY, Defendant - Appellant, Pro se, Florence, CO.

For ALLEN ARCHIE HURLEY, Defendant - Appellant: Ronald A. Krauss, Esq., Office of Federal Public Defender, Harrisburg, PA.

**Judges:** Before: FISHER, JORDAN and SLOVITER, Circuit Judges.

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Allen A. Hurley appeals his convictions for voluntary manslaughter, under 18 U.S.C. § 1112, and knowing possession of a prohibited object in prison, under 18 U.S.C. § 1791(a)(2), as well as the sentence imposed by the United States District Court for the Middle District of Pennsylvania. His attorney moves to withdraw as counsel, pursuant to *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967). Because there are no non-frivolous issues for appeal, we will grant the motion to withdraw and will affirm Hurley's conviction and sentence.

## I. Background

Hurley was charged in a two-count indictment for murdering a fellow inmate, in violation of 18 U.S.C. §§ 7(3) and 1111 (Count I), and for knowing possession of a prohibited object, in violation of 18 U.S.C. § 1791(a) (Count II). Hurley had been convicted of felonies on two prior occasions. In 1992, he was convicted of bank robbery and use of a firearm during a crime of violence, and was sentenced to 111 months' imprisonment. Not long after his release from serving that sentence, he was convicted of conspiracy to commit bank robbery, carrying a firearm during a crime of violence, possession of a firearm by a convicted felon, possession and disposal of a stolen motor vehicle, and witness tampering. At the time of the crimes at issue here, Hurley was serving a 448-month prison term for that second set of felonies.

The indictment in this case followed Hurley's killing of Joseph O'Kane, a fellow inmate at the **United States Penitentiary** ("USP") Canaan. Hurley pled not guilty, and a four-day jury trial was held. He testified that he and O'Kane scuffled inside his cell, and he admitted to stabbing {**543 Fed. Appx. 251**} O'Kane once, though he claimed it was in self-defense. Hurley said that he then blacked out and woke up in a pool of O'Kane's blood. The autopsy of O'Kane revealed 92 stab wounds, blunt force trauma, and penetrating trauma to the brain. In a letter to his uncle after the incident, Hurley wrote, "I am in an environment where I was forced to kill somebody because he wouldn't leave me alone." (App. at 613.) He also relied on the testimony of other inmates, who portrayed O'Kane and Hurley's relationship as both friendly and contentious, and described O'Kane as a bully. The jury found Hurley not guilty of second-degree murder, but guilty of the lesser-included offense of voluntary manslaughter. The jury also found Hurley guilty of knowing possession of a prohibited object in prison, namely, the "shank" with which Hurley killed O'Kane.

03CASES                                                         1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

> **UNITED STATES OF AMERICA v. JOSE MONTALBAN, Appellant**
> **UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**
> **604 Fed. Appx. 100; 2015 U.S. App. LEXIS 4946; 96 Fed. R. Evid. Serv. (Callaghan) 1498**
> **No. 14-3153**
> **February 13, 2015, Submitted Under Third Circuit L.A.R. 34.1(a)**
> **March 26, 2015, Opinion Filed**

**Notice:**

**NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT. PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.**

**Editorial Information: Prior History**

Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Crim. No. 3:13-cr-00001-001). District Judge: Malachy E. Mannion.

**Counsel** For United States of America, Plaintiff - Appellee: John C. Gurganus Jr., Esq., Office of United States Attorney, Scranton, PA.

For Jose Montalban, Defendant - Appellant: Gino Angelo Bartolai Jr., Esq., Wilkes-Barre, PA.

**Judges:** Before: CHAGARES, JORDAN, and VANASKIE, Circuit Judges.

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

VANASKIE, *Circuit Judge*.

Appellant Jose Montalban was convicted and sentenced to 180 months' imprisonment for assaulting a correctional officer with a plastic shank at the **United States Penitentiary**, Canaan ("U.S.P. Canaan"). On appeal, Montalban challenges two of the District Court's evidentiary rulings and its conclusion that the assault resulted in "serious bodily injury" for purposes of calculating his sentencing offense level under U.S.S.G. § 2A2.2(b)(3). For the reasons discussed below, we will affirm the District Court's judgment of conviction and sentence.

I.

The cafeteria at U.S.P. Canaan is staffed by inmate workers-like Montalban-whose activities are monitored by correctional officers designated "cook supervisors." After dinner was served on December 28, 2012, Montalban attacked Cook Supervisor Andrew Wisniewski in an office adjoining the cafeteria. Montalban repeatedly struck Wisniewski in the face with a sharpened plastic shank. Witnessing the assault, Cook Supervisor Mark Brennan activated a body alarm worn by officers at U.S.P. Canaan and rushed to Wisniewski's aid. Additional officers responded and were eventually able to pin Montalban and put him in restraints. In the ensuing search, the officers recovered the shank from underneath Montalban's body.

Wisniewski, bleeding from his facial wounds, was sent to the prison's health services department for a medical assessment. Patricia Burgerhoff, a registered nurse, examined Wisniewski and cleaned his wounds before sending him to a local hospital for further treatment. At the hospital, Wisniewski received a total of nine stiches for three puncture wounds he sustained to the right side of his face during the attack.

03CASES                                                                   1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT-D

---

**UNITED STATES OF AMERICA v. JESSIE CON-UI, Defendant.**
**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
2017 U.S. Dist. LEXIS 84831
No. 3:13-CR-123
June 2, 2017, Decided
June 2, 2017, Filed

---

**Editorial Information: Prior History**

United States v. Con-Ui, 2016 U.S. Dist. LEXIS 102555 (M.D. Pa., Aug. 4, 2016)

**Counsel** For Jessie Con-ui, Defendant: David A. Ruhnke, LEAD ATTORNEY, Ruhnke & Barrrett, Montclaire, NJ; James A. Swetz, LEAD ATTORNEY, Stroudsburg, PA; Mark F. Fleming, LEAD ATTORNEY, Law Office of Mark Fleming, Encinitas, CA.
For USA, Plaintiff: Amanda Haines, LEAD ATTORNEY, U.S. Department of Justice, Washington, DC; Francis P. Sempa, LEAD ATTORNEY, U.S. Attorney's Office, Scranton, PA; Robert J. O'Hara, LEAD ATTORNEY, Office of the U.S. Attorney, Scranton, PA.
**Judges:** A. Richard Caputo, United States District Judge.

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**1. Mr. Con-ui's Statements during an Exchange with Officer Boynton**

Shortly after 10:00 p.m. on February 25, 2013 at USP Canaan, correctional officer Jeremy Bennett discovered Officer Williams on the floor of prison Unit C-1 (the "Unit"), unconscious and bleeding from wounds on his face, head, and neck. (T.R. 11-13, 31, 67, 107, Doc. 1152). No inmates were in sight; it appeared that all inmates had retreated to their cells, which encircled the unit. (T.R. 13). The doors to their cells, however, were unlocked. (T.R. 32-33, 89-90, 107, 123). Officer Bennett immediately summoned other officers who quickly descended on the unit. (T.R. 13).

Upon entering the unit and learning of Officer Williams's condition, Lieutenant Brian Sudul yelled out: "I'm going to kill one of you motherfuckers." (T.R. 34). All one hundred seventeen (117) inmates housed in the Unit at the time remained in their cells. (T.R. 13, 132). Lt. Sudul then armed himself with a pepper ball gun and ordered officers to lock all cells. (T.R. 33-34, 35). Over the course of approximately ten minutes, all sixty-four (64) cell doors were individually locked without incident. (T.R. 33-35, 68, 107-08; Doc. 998-4, at 2). After all of the inmates were secured, Lt. Sudul left the Unit to assess Officer Williams's condition in the medical unit. (T.R. 37).

As is standard procedure, the officers began conducting visual upper body searches of each inmate. (T.R. 36). Shortly afterwards, following the discovery of blood on the stairs leading to Mr. Con-ui's cell, Officer Ryan Boynton, along with other officers, approached Mr. Con-ui's cell. (T.R. 70, 92, 110, 124).

Officer Boynton performed a visual upper body check and noticed a cut on the palm of Mr. Con-ui's hand. (T.R. 93). Officer Boynton said, "Did you do this?" Mr. Con-ui nodded his head in the affirmative. (T.R. 93). Officer Boynton then said, "You did this? You killed him? Over what?" Mr. Con-ui responded, "Yes, disrespect issue." (T.R. 93-94). Officer Boynton noticed that Mr. Con-ui was holding a clear plastic knife. (T.R. 94). Officer Boynton ordered Mr. Con-ui to slide the knife under the door, but Mr. Con-ui said, "No, I'll keep it." (T.R. 94). Officer Boynton ordered him again to slide the knife under the door and Mr. Con-ui said, "No, you'll kill me." (T.R. 94).

1yccases                                                         1

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

TRULINCS 22072052 - KING, MICHAEL - Unit: CAA-D-A          EXHIBIT-E

---

FROM: Diviesti, Barbara
TO: 22072052
SUBJECT: news
DATE: 01/05/2019 10:06:07 PM

CANAAN TOWNSHIP, Pa. -- After three weeks, there is still no deal to reopen the federal government, possibly leaving corrections officers at federal prisons across the country, and here in our area, without paychecks.

Working conditions inside the federal prison near Waymart can be difficult to endure. And for people who work inside, it's been tougher than usual since the government shutdown began because they say there's a chance they will not be paid.

"Going in every day and every day at our jail there's inmate fights, staff assaults. It's a dangerous job to not get paid for," said Jeremy Dominick, corrections officer.

"We don't work in a normal environment. We work somewhere that each and every one of us here today has been assaulted, been insulted, been threatened on a daily basis. And when you're told you have to report to work and not knowing if you're going to get paid the next pay day, it's frustrating," said Michael Moran, corrections officer.

For these officers, the concern is well warranted. Several years ago, they lost one of their own, Eric Williams, in the line of duty in Wayne County.

"Very stressful, it's very stressful for all our staff to worry about if they're gonna get paid. We work in one of the most violent prisons in the country, and every day you walk in there could be your last, and you're not gonna get paid for it," said Joseph Pellicano, corrections officer.

Corrections officers tell Newswatch 16 if this government shutdown lasts through this week, they won't be getting a paycheck. That means household expenses will be hard to manage.

"They don't know how their financial situation's gonna be. It's kind of not in their control," Pellicano said.

"We have child care and food for our kids. That's important, so it's horrible," said Dominick.

These officers say those concerns were not the hardships they were expecting by taking this job.

"I know we all signed up for this, but we expected a paycheck, and we do expect a paycheck, and hopefully this all comes to an end soon," Dominick added.

# Violence on the Rise in BOP Facilities

## by Brandon Sample

Killings, assaults and other acts of violence are becoming more widespread in the federal Bureau of Prisons (BOP), as the prison population increases and staff-to-prisoner ratios decline. Fifteen prisoner-on-prisoner BOP homicides occurred in 2008 compared with 12 in 2007. Serious assaults on staff increased to 82 in 2008 from 72 in 2007, following a decline in previous years.

The BOP operates 115 facilities that house over 205,000 prisoners. Most of the violence is relegated to U.S. Penitentiaries (USPs), which typically hold high-security offenders serving lengthy sentences.

On April 20, 2008, for example, a major 30-minute riot at the USP in Florence, Colorado broke out in the recreation yard. The incident began after white supremacist prisoners celebrating Adolf Hitler's birthday began yelling racial epithets at black prisoners. The white supremacists were drinking hooch, a form of homemade wine, and were armed with rocks and improvised weapons. Approximately 200 prisoners were involved in the melee.

To quell the riot, guards fired more than 200 M-16 rounds, 300 pepper balls and almost a dozen tear gas canisters, plus sting grenades. Two prisoners, Brian Scott Kubik and Phillip Lee Hooker, were shot to death by tower guards. Although the BOP initially reported that five other prisoners had been hurt, it was later learned that 30 prisoners and one staff member were injured during the incident.

Frank Sims, a prisoner allegedly involved in the riot, described the scene on the yard as "lil' Baghdad." Ken Shatto, president of the American Federal of Government Employees Local 1302 (AFGE), which represents BOP workers at the prison complex, remarked "It's the craziest thing in 15 years I've seen with the Bureau."

Outsiders like Mark Potok of the Southern Poverty Law Center, an organization that tracks hate groups, were surprised that white supremacist prisoners were allowed to congregate in the yard that day. "I'm not an expert in keeping prisons calm, but it certainly does seem like dangerous business to allow groups of white supremacist criminals to congregate on Hitler's birthday," said Potok. "The truth is, it is an iconic day in the white supremacist calendar."

Leann LaRiva, a spokesperson for USP Florence, said prisoners are not separated by race on Hitler's birthday or any other anniversary. "We don't discriminate on race or ethnicity or segregate," she said. Not even, apparently, to prevent riots that result in prisoners being shot to death.

Union officials have long called for increased staffing to help prevent such violent outbreaks – and, of course, to boost their membership ranks. In April 2008, just weeks before the riot occurred, Phil Glover, a legislative coordinator with the AFGE, testified before Congress about rising levels of violence in the BOP. Glover blamed the violence on insufficient staffing and resources.

According to Glover, the BOP has filled only 87 percent of staffing positions compared to 95 percent during the 1990s. He stated that staffing levels in federal prisons may drop as low as 76 percent if budget shortfalls continue. Compounding this staff shortage, BOP facilities are 36 percent over capacity systemwide.

The BOP has recognized the potential for increased violence due to staffing deficiencies. In a March 2008 memo, prison officials estimated that a projected $289 million budget shortfall could force the cutting of guard positions to the point "where safety and security of staff and inmates could be in jeopardy."

Immediately following the USP Florence riot, then-U.S. Senator Ken Salazar contacted Attorney General Michael Mukasey and requested that additional guards be sent to the facility. Salazar has also called on the BOP to release reports about the riot to the public.

"The people of Colorado, especially those in the communities surrounding the USP, deserve the assurance that the BOP is taking the steps necessary to improve security at the facility and prevent terrible incidents like this in the future," Salazar wrote to BOP Director Harley Lappin. Despite Salazar's requests, the BOP refused to release details regarding the riot, citing an ongoing investigation. The FBI is also conducting a review.

Amazingly, just three months after the riot, the warden of USP Florence, Sara Revell, received an Excellence in Prison Management award. According to Felcia Ponce, a BOP spokesperson, the award "recognizes outstanding contribution by a warden in the overall management of staff, inmates, and general population." The BOP did not comment on why Revell was given the award following a major riot.

On August 10, 2008, just weeks after Revell was recognized for her excellence in prison management, USP Florence was again placed on lockdown due to a prisoner-on-prisoner homicide.

Violence at USP Florence has even extended to the visiting room. In November 2008, days after visitation was restarted at the institution, a prisoner attacked two visitors. An unidentified BOP guard claimed the prisoner tried to stab his wife and mother-in-law. "It was some type of paper, folded or rolled really tight with a blade in the end of it," the guard said. "He managed to cut his wife's neck and then tried to cut up the mother a little bit." The visitors were taken to a hospital and released.

The BOP is in the process of separating outside recreation yards at all USPs into smaller, more manageable areas. While the timing of the change may seem related to the Florence riot, BOP officials said it was part of a nationwide move following the June 20, 2008 murder of Jose Rivera, a guard at USP Atwater in California.

Rivera was stabbed at least 28 times with an 8" ice pick-like weapon; he was unarmed, had no protective equipment, and other prison employees were delayed in coming to his rescue due to a locked door. The two prisoners accused of stabbing Rivera to death, Jose Cabrera Sablan and James Ninete Leon Guerrero, who are both serving life sentences, are scheduled to go to trial on murder charges in September 2010. They face the death penalty.

USP Atwater was placed on lockdown for three months after Rivera was killed. Once the lockdown was lifted, the prison was plagued by numerous fights – including a dozen stabbings over a one-week period – which resulted in another lockdown. In November 2008 the BOP replaced Atwater warden Dennis Smith, who was transferred to a medium-security facility.

A subsequent BOP report found that weapons were commonly available at USP

Atwater and prisoners were able to get drunk on homemade alcohol. The prisoners who killed Rivera were reportedly drunk at the time. Between 2005 and 2007 the number of prisoner-on-staff assaults at Atwater had quadrupled from 13 to 57 per year. This included assaults involving prisoners spitting or throwing urine on guards, and attacking them with fists or food trays. Half of the reported assaults took place in the facility's Special Housing Unit.

The AFGE sharply criticized the BOP over Rivera's murder, calling for the resignation of top BOP officials and demanding that prison guards be provided with stab-proof vests and Tasers, pepper spray and other self-defensive equipment.

"We have lost all faith in the BOP management," stated AFGE president John Gage. "It's incredible to us that the Bureau is making this a labor dispute, that they refuse to give these basic, common-sense tools to our officers. We feel, in the Rivera case, if these simple things we are asking had been granted, he would be alive today."

Violence in the BOP has not been confined to USP Florence and Atwater. USP Pollock in Louisiana was the leader in prisoner-on-prisoner homicides in 2007. Two prisoners, Tyrone Johnson and Derrick Sparks, were killed in April 2007 after being stabbed with homemade weapons. Three months later another two prisoners were stabbed in the stomach. In November 2007, prisoners William Bullock and Donald Till were murdered by other prisoners. USP Pollock rang in the new year in January 2008 with the killing of prisoner Peter Avalos Gutierrez, 55, barely a month after he was transferred to the facility. He was stabbed to death with a shank.

Other institutions with high levels of violence include USP Beaumont, better known as "Bloody Beaumont." In November 2007, prisoner Gabriel N. Rhone was stabbed to death; a guard received 13 puncture wounds during the attack, which involved two other prisoners.

USP Lee is another honorable mention. On September 30, 2008, prisoner Quentin Corniel died after sustaining multiple stab wounds. He was less than a year away from his release date.

The Metropolitan Correctional Center (MCC) in Chicago, Illinois; the Federal Correctional Institution (FCI) in Three Rivers, Texas; and the FCI in Phoenix, Arizona round out the top-ranked BOP facilities for levels of violence.

Jason Katz, serving a nine-month sentence, was beaten to death at the MCC in March 2008 by fellow prisoner Jason Tolen, 20, who was indicted on second-degree murder charges. At FCI Three Rivers, a prisoner was killed during a fight in March 2008. And a brawl involving three prisoners at FCI Phoenix in January 2008 resulted in one prisoner suffering stab wounds to the head.

Other BOP facilities have experienced their own share of violence. On January 25, 2009, a "large-scale fight" at Federal Correctional Complex (FCC) Coleman, located about 50 miles northwest of Orlando, Florida, left eight prisoners hospitalized with stab or gunshot wounds. One of the prisoners was shot by guards "to prevent possible loss of life," stated Rita Teel, a BOP spokeswoman.

Another major fight broke out at the facility in March 2009 that involved dozens of prisoners and left 14 prisoners with serious injuries. Eleven were airlifted to hospitals. FCC Coleman was placed on lockdown, and the incident is under investigation. "It was a busy day, to say the




**Violence in BOP Facilities (cont.)**

least," said Jim Judge, director of Lake-Sumter Emergency Medical Services.

Two separate fights at the USP in Tucson, Arizona on May 28, 2009 sent three prisoners to the hospital with stab wounds. Most recently, FCI Victorville was placed on lockdown on June 6, 2009 following an attack by prisoners in which four staff members suffered minor injuries, and on June 11 a prisoner was shot by guards at USP Terre Haute during a fight with another prisoner on a recreation yard. Both prisoners were hospitalized.

On June 18, 2009, the U.S. House of Representatives passed an appropriations bill that includes $71 million for hiring 745 new BOP guards; the bill still must be approved by the Senate. It is hoped that an increase in staffing levels will reduce violence in federal prisons. The BOP has taken additional steps to confront increasing levels of violence, including transferring high-security offenders to other facilities and prosecuting prisoners involved in fights.

In October 2008, the BOP created a new security level – dangerous prisoners at USP Atwater will be sent to USP Lewisburg in Pennsylvania, a high-security prison. "What we've seen is some very positive steps and progress. We are going to see a change in the entire federal penitentiary system," stated U.S. Rep. Dennis Cardoza, after touring Atwater.

Rep. Cardoza introduced federal legislation in 2008 that would have required the BOP to provide stab-resistant vests to all federal prison guards, who would have to wear them while on duty (H.R. 6462). The bill, titled the "José Rivera Correctional Officer Protection Act," failed to pass; however, the BOP has been distributing vests to BOP staff who request them.

In regard to prosecutions, in October 2008 two FCC Terre Haute prisoners, Michael S. Vaught and Whitney H. Smith, were indicted on charges of assault with intent to commit murder and assault resulting in serious bodily injury, resulting from a May 27, 2008 razor attack on another prisoner. In August 2008, FCC Coleman prisoners Gerardo Martinez and Osbaldo Farias were charged with conspiracy to commit murder in connection with the October 2007 death of Orlando Yazzie, who was beaten and stabbed to death in a recreation cage.

On June 4, 2009, USP Big Sandy prisoner Manuel Cardosa, 28, was convicted of attacking and stomping fellow prisoner Marvin Fontenette, leaving him paralyzed and half-blind. While prison officials may not be able to prevent violence at BOP facilities, that doesn't stop them from prosecuting violent offenders after the fact.

Meanwhile, in June 2009, the mother of slain prison guard Jose Rivera filed a lawsuit against federal officials, including BOP Director Harley Lappin and former Atwater warden Dennis Smith. The suit alleges that BOP officials "willingly and knowingly participated in the creation of dangerous conditions that resulted in [Rivera's] death." See: *Rivera v. Lappin*, U.S.D.C. (E.D. Cal.), Case No. 1:09-cv-00954-LJO-SMS.

According to Mark J. Peacock, the attorney representing Rivera's family, "Officer Rivera's death highlights the complete and utter breakdown of the prison's management in protecting their employees. This can't be allowed to continue."

The same can be said about the inability of BOP officials to protect prisoners from increasing levels of violence, which also cannot be allowed to continue.

Sources: *Colorado Independent, Rocky Mountain News, Denver Post, Associated Press, Channel 13 KRDO, Corpus Christi Caller-Times, Beaumont Enterprise, Arizona Republic, Chicago Tribune, Bristol Herald Courier, www.thetowntalk.com, KSWT, http://corspecops.com*

# Judge Sonia Sotomayor Denied My Appeal and I Spent 16 Years in Prison for a Crime I Didn't Commit

*by Jeffrey Deskovic*

My name is Jeffrey Deskovic. At age 17, I was wrongfully convicted of murder and rape, a conviction that was based upon a coerced false confession, the fabrication of evidence, prosecutorial misconduct, and fraud by a medical examiner. I was cleared 16 years later – almost three years ago – when DNA evidence proved my innocence, while also identifying the real perpetrator, who subsequently confessed to the crime. Since my release, I have made it my life's mission to battle against wrongful convictions and fight for legislation that would minimize the chances of what happened to me happening to someone else. It is this fight that compels me to speak out about Supreme Court nominee Sonia Sotomayor.

Before I was exonerated, I sought out every legal avenue I could to win my freedom. I defended my innocence before the New York Appellate Division, raising such proof as the fact that the physical evidence found did not match me and arguing that the police violated my rights by coercing a false confession from me at the age of 16. The court ruled against me 5 to 0, concluding that there was nothing wrong with my interrogation and stating that there was "overwhelming evidence of guilt," despite the fact that there was no evidence beyond my forced confession. In truth, the DNA and the hairs found on the victim's body were evidence of my innocence.

When my lawyer was denied a chance to reargue the case on the grounds that the court's decision ran counter to the law and to the facts, we moved to the Court of Appeals, the highest court in New York. I filed a Writ of Habeas Corpus, in which I argued that my conviction was a violation of the U.S. Constitution. The year was 1997. The year before, Congress had passed Bill Clinton's Anti-Terrorism and Effective Death Penalty Act (often called AEDPA in legalese), which mandated that from then on, all state prisoners would have only one year to appeal to a federal court after being denied an appeal by their state's highest court.

As a result, there was some confusion in the federal courts regarding the filing procedure; it was not clear how the new law would apply to cases already in the system. Different jurisdictions were answering the question in different ways. My lawyer called the court clerk and asked whether it was enough that my petition be post-marked on the due date, or if it had to physically be filed and in the building on the due date. The court clerk told my attorney that it was enough that it be postmarked. That information turned out to be false.

# Prison wardens reap rewards

## Despite violence, guard shortages, $1.6M in bonuses paid

**Kevin Johnson**
USA TODAY

WASHINGTON – The federal prison system paid $1.6 million in bonuses to its top executives and wardens during the past two years despite chronic staffing shortages and sharp critiques of prison management leveled by Congress, according to records obtained by USA TODAY.

The payments – the latest in a series of annual awards – ranged from $5,400 to $23,800 per official. The largest sums went to the agency's leadership team, including $20,399 to the U.S. Bureau of Prisons' acting director, Hugh Hurwitz, and the wardens of prisons who confronted what union officials described as dangerous shortages of guards.

Joseph Coakley, who managed the maximum security complex in Hazelton, West Virginia, where notorious gangster Whitey Bulger and two other inmates were murdered last year, received $20,399. Coakley, who retired this year, collected an additional $34,500 in awards paid out during 2015 and 2016 for his work at Hazelton and at a facility in Beckley, West Virginia.

Bulger's murder drew a harsh spotlight to conditions at the Hazelton prison complex, where in addition to the violence, authorities had long grappled with officer vacancies that persisted at federal prisons across the country.

A shortage of prison officers forced



The prison complex in Coleman, Fla., is short about 200 staffers. The warden got a bonus of more than $20,000. AP

See PRISON, Page 4A

EXHIBIT-6

# Prison

Continued from Page 1A

wardens to tap secretaries, teachers, nurses, kitchen workers and other non-security staffers to patrol cellblocks, solitary confinement units and prison yards, often with little preparation for their new roles.

Known as "augmentation," the practice was condemned by lawmakers after the scope of its use was outlined last year by USA TODAY.

Prison officials would not reveal how they decide on the size of wardens' bonuses, citing security concerns.

"Bonuses are given based upon work performance," the bureau said in a written statement.

### 'Grounds for serious concern'

At least two congressional committees raised questions about the widespread deployment of civilian staffers to cover officer vacancies and other management issues in the federal prison system. The Bureau of Prisons is the nation's largest correctional system, responsible for managing 121 facilities that house 180,000 inmates.

Last year, Senate Homeland Security and Government Affairs Chairman Ron Johnson, R-Wis., cataloged allegations by whistleblowers in a letter to Hurwitz, including sexual harassment complaints against bureau officials, prison security breaches, assaults on guards and persistent staffing shortages.

"These allegations are grounds for serious concern," Johnson wrote.

Senate committee investigators, in addition to reviewing the allegations of mismanagement, questioned the bonus awards. "Please explain how BOP decides to promote, reward or give bonuses to staff, including those involved in sexual abuse allegations," a committee investigator wrote to one bureau staffer last year. The investigator's questions, reviewed by USA TODAY, did not specifically identify officials accused of sexual abuse.

Addressing its use of civilian staffers to cover guard posts, the bureau said, "Staffing decisions are based on the needs of the facility, and augmentation is one tool to ensure critical correctional officer posts are covered on a daily basis. All wardens are responsible for ensuring a safe and orderly running of correctional facilities and use every means possible to ensure the safety of staff, inmates and the public."

Deputy Attorney General Jeffrey Rosen indicated in an interview with USA TODAY that Justice was reviewing staffing across the BOP. He said personnel levels did not jeopardize safety. "Everyone who is trained to work at a federal prison learns to participate in the security role," he said.

### Guard shortages

At the Hazelton prison, staffing has been a constant concern among union officials, particularly in the weeks before Bulger's murder Oct. 30, 2018. In a letter to federal lawmakers earlier that month, Justin Tarovisky, executive vice president of the prison workers union, noted that Hazelton was short 40 officers and expressed frustration with Warden Coakley's management.

After learning that Coakley collected thousands in bonus money, Tarovisky said, "I wish I could say I was surprised. These wardens are using augmentation (covering guard positions with civilian staffers) to avoid paying overtime to officers, and they are being rewarded for it. It's sad."

Coakley declined to comment.

Prison officials and the Justice Department's inspector general have been reviewing the conditions at Hazelton during the time of Bulger's murder and the two other deaths at the prison. A separate criminal investigation into Bulger's killing also continues.

After Coakley's retirement, Tarovisky said, conditions have steadily improved under the prison's new warden, Bryan Antonelli. Union officials said hiring is on pace to wipe out the officer shortage as soon as next week.

At other prisons, the staffing problems persist, and the bonus payments generated fresh outrage.

"This is completely disheartening," said Joe Rojas, union chief at the bureau's largest prison complex in Coleman, Florida, where he said a staffing report showed that the complex was down about 200 people from its authorized 1,370 staffers.

The warden at Coleman, Roy Cheatham, is listed as having received a $20,399 bonus during the most recent distribution in 2017-2018.

United States Penitentiary Canaan
John Coleman 81114001
PO Box 300
Waymart, PA 18471

RECEIVED
SCRANTON
SEP 30 2019
PER RF
         DEPUTY CLERK

Legal

Office of the Clerk
United States District Court
Middle District of Pennsylvania
235 North Washington Avenue
Scranton, PA 18501 USA